**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>James E. Pietrangelo, II</u>

     v.                           Case No. 21-cv-124-PB
                                         Opinion No. 2021 DNH 067

<u>Christopher T. Sununu et al.</u>


**<u>MEMORANDUM AND ORDER</u>**


James Pietrangelo has sued New Hampshire Governor Christopher Sununu and other State of New Hampshire ("State") officials arising out of the State's plan for the distribution of COVID-19 vaccines.  Before me is Pietrangelo's request for a preliminary injunction, wherein he seeks to enjoin the defendants from using "race, ethnicity, or minority-group status" as a factor in vaccine distribution.  The defendants object.  Because Pietrangelo has not demonstrated that he has standing to seek the requested relief, I deny his motion.

**I.   <u>BACKGROUND</u>**

**A.   <u>Factual Background</u>**

In March 2020, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") officially declared the novel Coronavirus Disease 2019 ("COVID-19") a pandemic.  In response to the threat to public health and safety, the President of the United States declared a national emergency, and Governor Sununu declared a state of emergency in

New Hampshire.  To date, COVID-19 has caused approximately 553,000 deaths in the United States, and 1,249 in New Hampshire.

Since December 2020, the Food and Drug Administration has authorized three vaccines for emergency use in the prevention of COVID-19.  Because of a limited supply, the State could not obtain sufficient doses to inoculate its entire population at once.  To obtain federal immunization funding, the State had to submit a vaccine allocation plan to the CDC for approval.  The State consulted several resources in preparing its plan, including guidance and direction from the CDC and the National Academies of Sciences, Engineering, and Medicine (NASEM).[1]

At the CDC's request, NASEM assembled the Ad Hoc Committee on Equitable Allocation of Vaccine for the Novel Coronavirus ("Committee").  In October 2020, the Committee released a report that offers a framework for equitable allocation of COVID-19 vaccines ("NASEM Report").  The NASEM Report cited extensive data showing that COVID-19 has had a "disproportionate impact on people who are already disadvantaged by virtue of their race and ethnicity, age, health status, residence, occupation, socioeconomic condition, and/or other contributing factors."  Aff. of Elizabeth Talbott, Doc. No. 13-2 ¶ 27 (quoting NASEM Report at 2).  With respect to minorities, data showed that

---

[1] NASEM is a private, nongovernmental institution that advises the nation on issues related to science and technology.

COVID-19 has "disproportionately affect[ed] particular racial and ethnic minority groups, including Black, Hispanic or Latinx, American Indian and Alaska Native, and Native Hawaiian and Pacific Islander communities."  Doc. No. 13-2 ¶ 27 (quoting NASEM Report at 2).  Nationally, these groups have experienced on average infection rates nearly three times higher, hospitalization rates nearly five times higher, and mortality rates between one and two times higher than non-Hispanic whites. Doc. No. 13-2 ¶ 27 (citing NASEM Report at 3-4).[2]

The NASEM Report outlined a phased framework for vaccine allocation that was guided by data on how to reduce deaths, prioritize vulnerable populations, and maximize societal benefit.  In addition to the phased approach, the NASEM Report recommended setting aside a percentage of the vaccine supply to target vulnerable geographic areas identified through the CDC's Social Vulnerability Index or the more specific COVID-19 Community Vulnerability Index ("CCVI") developed by the Surgo Foundation.  The Committee explained that those indices "represent and attempt to incorporate the variables that the committee believes are most linked to the disproportionate

---

[2] New Hampshire's figures closely track the national trend. Racial and ethnic minorities in the State have experienced on average infection rates 2.8 times higher, hospitalization rates 4.4 times higher, and mortality rates 1.5 times higher than non-Hispanic whites, after adjusting for differences in age distribution.  Aff. of Kirsten Durzy, Doc. No. 13-6 ¶ 16.

3

impact of COVID-19 on people of color."  Doc. No. 13-2 ¶ 32
(quoting NASEM Report at 9).

In its guidance to the states, the CDC endorsed the NASEM
Report and echoed the Committee's recommendations both in terms
of creating a phased vaccination program and focusing separately
on "critical populations," including minority groups.  The CDC
also suggested partnering with local agencies and organizations
to reach those populations.

Consistent with guidance from the CDC and NASEM, New
Hampshire's vaccine allocation plan consists of two components.
The first is a phased allocation plan for distributing COVID-19
vaccines statewide, through which at least 90% of the State's
vaccine supply is being disseminated ("general plan").  The
second is a separate "equity" allocation plan for distributing
up to 10% of the vaccine supply to "critical populations" living
in census tracts deemed most vulnerable to COVID-19 ("equity
plan").

The general plan has three phases, with each phase split
into two sub-phases.  In Phase 1a, the State distributed
vaccines to high-risk health workers, first responders, and
residents and staff of long-term care facilities.  In Phase 1b,
people over the age of 65, medically vulnerable individuals at
high risk for severe illness from COVID-19, family caregivers of
medically vulnerable minors, residents and staff of residential

facilities for persons with intellectual and developmental disabilities, staff of correctional facilities, and remaining health workers became eligible for vaccination.  In Phase 2a, vaccination opened to K-12 school and childcare staff.  In Phase 2b, the State offered vaccines to residents between the ages of 50 and 64.  In Phase 3a, medically vulnerable individuals under 50 years old at moderate risk for severe illness from COVID-19 became eligible for inoculation.  Finally, in Phase 3b, the current phase, the State is offering vaccines to everyone else over the age of 16.

The equity plan, launched at the same time as Phase 1b, was designed to reach vulnerable individuals residing in census tracts identified as at risk of disproportionate impact from COVID-19.  Following NASEM's recommendation, the State utilized the CCVI to identify the top 25%, or the top quartile, of the State's census tracts most susceptible to disparate effects from COVID-19.  Seventy-four census tracts, out of a total of 294, were deemed eligible to partake in the equity plan.

The CCVI combines COVID-specific epidemiological risk factors and health system capacity variables with the sociodemographic variables from the CDC's Social Vulnerability Index to assess which geographic areas may be less resilient to the impacts of the pandemic.  At the time the State utilized it, the CCVI employed database programming based on thirty-four

indicators grouped into six "core" themes: (1) socioeconomic status, (2) household composition and disability, (3) minority status and language, (4) housing type and transportation, (5) epidemiological factors, and (6) healthcare system factors.[3]  All themes were weighted equally to calculate a composite metric

---

[3] The current version of the CCVI uses forty indicators grouped into seven themes.  Minority status and language is a theme in both versions.  As I discuss in the analysis section, the differences between the two versions of the index do not affect the outcome in this case.  For the sake of clarity, I note that the State's witness, Kirsten Durzy, described generally the seven-theme CCVI, see Doc. No. 13-6 ¶ 22, but an exhibit to her affidavit shows that the State relied on the six-theme CCVI. Specifically, an internal State document providing guidelines for implementing the equity plan describes themes as they appear in the six-theme CCVI and references a document discussing the methodology for the six-theme CCVI.  See Ex. D to Durzy Aff., Doc. No. 13-10 at 13 (listing themes and citing for full list https://docs.google.com/document/d/1aN9BcOYoJcr7p9zRnwBHYJ_02fKD yJJavnjTl3A0JT0/edit).  The State's exhibit also includes a list of census tracts in the top quartile for vulnerability, along with a composite metric for each.  See Doc. No. 13-10 at 6-8. According to Durzy, that list was based on data sourced from the CCVI's website.  See Doc. No. 13-6 ¶ 20 (citing https://previsionforcovid.org/ccvi).  This website currently presents data for the seven-theme CCVI, whose composite metrics do not match the State's metrics for the same seventy-four census tracts, and in some instances, their rankings are different.  Compare Doc. No. 13-10 at 6-8, with https://covid-static-assets.s3.amazonaws.com/US-CCVI/ccvi-US.xlsx (accessed March 26, 2021).  That website, however, contained data for the six-theme CCVI through December 2020, shortly before the State announced it was utilizing the CCVI in January 2021.  See https://web.archive.org/web/20201201102806if_/https://precisionf orcovid.org/ccvi.  The rankings and composite metrics for New Hampshire's census tracts in the six-theme CCVI perfectly match both the State's rankings of the most vulnerable census tracts and their composite metrics.  Compare Doc. No. 13-10 at 6-8, with https://docs.google.com/spreadsheets/d/1qEPuziEpxj-VG11IAZoa5RWEr4GhNoxMn7aBdU76O5k/edit#gid=617443512.

that ranked each census tract relative to one another on a 0 – 1 scale, with 0 representing the least vulnerable and 1 representing the most vulnerable census tract.  The most vulnerable census tract in New Hampshire was ranked 0.922, and the last census tract that made it into the top quartile for vulnerability was ranked 0.248.  <u>See</u> Ex. D to Durzy Aff., Doc. No. 13-10 at 6-8.

To qualify for a vaccine under the State's equity plan, a person must "predominantly reside" in a vulnerable census tract <u>and</u> must satisfy at least one of the following criteria: identifies as a racial or ethnic minority, defined as all groups except non-Hispanic white; is homeless; lives below the federal poverty level; is geographically isolated; is homebound; has physical barriers to travel; lacks a computer or reliable internet to register for vaccination through the general plan; lacks a medical home; has language or communication access barriers; or has other access barriers.  Doc. No. 13-10 at 1.

The State has partnered with the thirteen New Hampshire Regional Public Health Networks ("RPHNs"), each serving a defined public health region in the State, to distribute COVID-19 vaccines through the equity plan.  The RPHNs can distribute vaccines in four ways.  First, and primarily, the RPHNs work with service agencies in vulnerable census tracts, such as homeless shelters and soup kitchens, to schedule mobile clinics

for their clients.  At such clinics, the RPHNs are not required
to ask for any identification documents.  Second, the RPHNs can
schedule clinics not affiliated with one service agency, by
hosting a mobile clinic at a local site in a vulnerable census
tract familiar to the targeted populations, such as a faith or
community-based organization.  The RPHNs utilize community
health or outreach workers to engage local community members in
that census tract who meet the criteria to come to the
vaccination clinic.  The State directed the RPHNs to ensure that
they are serving only New Hampshire residents at such clinics,
including through pre-clinic advertising that the clinic is only
open to New Hampshire residents, asking for proof of residency
or identification at the vaccination site, or, for those who do
not have such proof, asking them where they live.  Third, the
RPHNs can schedule clinics that aim to vaccinate unsheltered
homeless persons in locations where they may be living, such as
encampments.  Fourth, the RPHNs may vaccinate persons referred
to them by the State who qualify for a vaccine under the
guidelines of the equity plan and require special accommodation,
such as home visits for homebound residents.

The State does not stockpile 10% of the total vaccine
supply for use as part of the equity plan.  Instead, when an
RPHN schedules a clinic, it must request from the State, one
week in advance, the amount of vaccine it expects to use to

inoculate qualifying individuals at that clinic.  The State approves the request if it meets two requirements: (1) the clinic will serve the targeted populations in a vulnerable census tract, and (2) there is enough vaccine in the 10% allocation to cover all requests that week.  If the allocation requests exceed the 10% allocation, the State works with the RPHNs to adjust the requests.  In the event that not enough vaccine is available for everyone who wants to be inoculated at a clinic, priority is given to those who are older, have more comorbidities, live in multi-generational households, have greater access barriers, have more public contact, did not have COVID-19 within the prior ninety days, or have fewer opportunities for vaccination through other means.  Doses that are not administered as part of the equity plan become available to vaccinate people through the general plan.

As of February 23, 2021, sixty-two clinics in eleven public health regions were held via the equity plan, including at homeless shelters, senior housing locations, low-income housing locations, community health centers, soup kitchens, rescue missions, community agencies, and individual homes.  A total of 7,107 doses were administered at those clinics, representing 4-5% of the State's vaccine supply.  The State has never used 10% of its vaccine supply as part of the equity plan because, according to the State, the populations it aims to vaccinate are

hard to identify and reach.  Again, the remaining doses backflow into the general plan, so no vaccines are wasted or stockpiled for later use.

**B.  <u>Procedural Background</u>**

Pietrangelo is a white, 55-year-old New Hampshire resident who wants a COVID-19 vaccine "as soon as possible."  Compl. ¶ 21.  He filed this suit in February 2021, challenging the constitutionality and legality of the State's vaccine allocation plan on the ground that it discriminates on the basis of race by prioritizing minority populations.  The complaint asserts that the plan violates (1) equal protection under the Fifth and Fourteenth Amendments to the United States Constitution, (2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and (3) Title VI of Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a).

Simultaneously with his complaint, Pietrangelo filed a motion seeking a temporary restraining order and a preliminary injunction.  I denied the motion to the extent it requested a temporary restraining order because Pietrangelo failed to demonstrate that he would suffer immediate and irreparable injury before there was time to schedule a hearing on his request for a preliminary injunction.  <u>See</u> Doc. No. 4.  At Pietrangelo's request, I scheduled an expedited preliminary

injunction hearing, which was held on March 19.  <u>See</u> Doc. No. 8.[4]
Prior to the hearing, the defendants objected to the motion and
voluntarily shared with Pietrangelo evidence concerning the
State's vaccination efforts, which I summarized above.

At the hearing, the parties agreed that Pietrangelo lives
in Glen, a village within the Bartlett census tract (tract 9551)
in Carroll County.  The defendants represented, and Pietrangelo
did not contest, that Bartlett is a very low vulnerability
census tract that does not rank within the top 25% most
vulnerable census tracts in the State.

Kirsten Durzy, MPH, testified at the hearing.  She has
served in several key roles during the planning, preparation,
and implementation of the State's vaccine allocation plan,
including as the State's COVID-19 Equity Subject Matter Expert.
Durzy's testimony was consistent with the evidence the State
submitted in its objection to the preliminary injunction motion.
She emphasized that geography is at the center of the equity
plan, which was designed to "look at both place [of residence]
and [individual] vulnerability."  Tr. 35.  Thus, a New Hampshire

---

[4] At the time of the hearing, Pietrangelo had not received a
COVID-19 vaccine.  Vaccination for his age group (Phase 2b)
began on March 25.  Given that vaccine appointments are now
available to all age groups, presumably Pietrangelo has already
received, or will receive shortly, his vaccine.  I note that
this would raise mootness concerns, but since the parties have
not raised that issue, I do not address it.

resident who identifies as a minority but does not predominantly live in one of the seventy-four vulnerable census tracts is not eligible for vaccination through the equity plan.  Tr. 35, 46. Durzy also testified that the State does not advertise the times and locations of clinics scheduled through the equity plan, and she did not believe the RPHNs did so either.  Tr. 47.  In other words, "the program . . . is really intended to find people, it's not intended for people to find the program."  Tr. 46.

## II.  STANDARD OF REVIEW

A preliminary injunction is "an 'extraordinary and drastic remedy' that 'is never awarded as of right.'"  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).  A plaintiff seeking a preliminary injunction must show that: (1) he is likely to succeed on the merits of his claim; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in his favor; and (4) injunctive relief is in the public interest.  Id. Likelihood of success on the merits is the most important factor.  Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 22 (1st Cir. 2020).  "To demonstrate likelihood of success on the merits, plaintiff[] must show more than mere possibility of success — rather, [he] must establish a strong likelihood that [he] will ultimately prevail."  Sindicato

Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (internal quotation marks omitted).  If the plaintiff cannot demonstrate that he is likely to succeed on the merits, the request for a preliminary injunction must be denied.  Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015).

The plaintiff, as the party invoking the court's jurisdiction, bears the burden of establishing standing.  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014).  "[E]ach element of Article III standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'"  Bennett v. Spear, 520 U.S. 154, 167–68, (1997) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  Although neither the Supreme Court nor the First Circuit has squarely addressed this burden at the preliminary injunction stage, several circuit courts have held that "the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction," including standing.  Waskul v. Washtenaw Cnty. Cmty. Mental Health, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (quoting Obama v. Klayman, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J.)); see also Yazzie v. Hobbs, 977 F.3d 964, 966 (9th Cir. 2020).  In other words, a party who seeks a preliminary injunction "must show a 'substantial likelihood' of

standing." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting Klayman, 800 F.3d at 568 (Williams, J.)).  This is so because an "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's <u>reaching</u> the merits, which in turn depends on a likelihood that plaintiff has standing." Waskul, 900 F.3d at 256 n.4 (internal quotation marks omitted). "A party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." Vilsack, 808 F.3d at 913.

## III. <u>ANALYSIS</u>

The defendants argue that Pietrangelo has not shown that he has standing to seek a preliminary injunction and that his substantive claims lack merit.  Pietrangelo disagrees on both counts.  Because I conclude that Pietrangelo has not established a substantial likelihood of standing, I have no jurisdiction to award him the relief he seeks and thus need not address the parties' remaining arguments.

Rooted in Article III's case-or-controversy requirement, the constitutional core of standing requires a showing that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547

(2016).  An injury in fact must be "concrete and particularized"
and "actual or imminent, not conjectural or hypothetical."
Lujan, 504 U.S. at 560 (internal quotation marks and citations
omitted).  An injury in fact is fairly traceable to the
defendant's conduct where there is "a causal connection between
the injury and the conduct complained of" such that the injury
is not the result of "independent action of some third party not
before the court."  Id. at 560 (internal quotation marks
omitted).  The redressability requirement entails a showing that
it is "likely, as opposed to merely speculative, that the injury
will be redressed by a favorable decision" for the plaintiff.
Id. at 561 (internal quotation marks omitted).

The Supreme Court has rejected the notion "that every
citizen has 'standing to challenge every affirmative-action
program on the basis of a personal right to a government that
does not deny equal protection of the laws." United States v.
Hays, 515 U.S. 737, 744 (1995) (quoting Valley Forge Christian
Coll. v. Ams. United for Separation of Church & State, Inc., 454
U.S. 464, 489-90 n.26 (1982)).  "[E]ven if a governmental actor
is discriminating on the basis of race, the resulting injury
'accords a basis for standing only to those persons who are
personally denied equal treatment by the challenged
discriminatory conduct.'"  Id. at 743-44 (quoting Allen v.
Wright, 468 U.S. 737, 755 (1984) (internal quotation marks

omitted)).  Thus, standing may not rest upon a generalized grievance against governmental conduct of which the plaintiff disapproves; rather, the plaintiff must show a particularized denial of equal treatment to establish standing to sue.  See id.

Where the plaintiff seeks prospective relief for an injury stemming from his inability to compete for a governmental benefit on equal footing, the plaintiff "satisfies the injury requirement if he shows (1) a likelihood that he will compete for the governmental benefit in question in the future, and (2) that he will be prevented from competing on equal footing because of the government's discriminatory practice." Cotter v. City of Bos., 323 F.3d 160, 167 (1st Cir. 2003); accord Ne. Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666 (1993).  In other words, the plaintiff need not prove that he would be successful in obtaining that benefit, but he must demonstrate that "he is 'able and ready' to apply for the benefit and that the challenged 'discriminatory policy prevents [him] from doing so.'" Donahue v. City of Bos., 304 F.3d 110, 119 (1st Cir. 2002) ("Donahue I") (quoting Jacksonville, 508 U.S. at 666). The plaintiff lacks standing to seek injunctive relief from the operation of a race-conscious program if he would not be able to compete for the benefit in question because of race-neutral

requirements.  See Donahue v. City of Bos., 371 F.3d 7, 14 (1st Cir. 2004) ("Donahue II").

The First Circuit's decision in Donahue II illustrates these principles.  There, a white applicant for a police officer position with the City of Boston challenged the City's affirmative action program under the equal protection clause. Id. at 10.  The First Circuit affirmed the district court's decision that the plaintiff had failed to establish standing to seek injunctive relief.  The court explained that the plaintiff was not "able and ready" to apply for appointment to the Boston Police Department because, at the time of the district court's decision, he was no longer eligible for hire due to an age restriction imposed by a state statute.  Id. at 14-15.  As a result, the plaintiff was not prevented from competing for a position by virtue of the challenged discriminatory policy but rather due to a race-neutral requirement that applicants be younger than thirty-two years of age, which applied to all applicants regardless of race.  See id.

Pietrangelo maintains that he has an injury in fact because (1) he is unable to apply for a COVID-19 vaccine through the equity plan as a result of the weight that the equity plan gives to minority status, and (2) the equity plan's preference for minorities has a stigmatizing effect on him as a white person. The record before me does not support either theory of standing.

17

Pietrangelo has not demonstrated that he is "able and
ready" to participate in the equity plan but cannot do so
because of the plan's discriminatory criteria.  See
Jacksonville, 508 U.S. at 666; Donahue II, 371 F.3d at 14-15.
The equity plan is fundamentally a geography-based program that
identifies, by census tract, areas whose residents may be
eligible for vaccination.  Only residents of the top 25% tracts
deemed most vulnerable to the impacts of COVID-19 may qualify
for a vaccine through the equity plan.  Pietrangelo does not
live in one of those tracts.  Bartlett, where he resides, is a
very low vulnerability tract that is not even close to the top
25% most vulnerable tracts.  In the six-theme CCVI, Bartlett is
ranked 144th out of 294 tracts, which is near 50% for overall
vulnerability.  In the seven-theme CCVI, it is ranked 195th out
of 294 tracts, falling in the bottom 50% for overall
vulnerability.[5]  Thus, residents of Bartlett, regardless of their
race or ethnicity, do not qualify for a vaccine through the
equity plan.

Pietrangelo has also presented no evidence that Bartlett
would qualify as a vulnerable census tract but for the State's

---

[5] Bartlett's composite metric in the six-theme CCVI is 0.124,
whereas the last tract in the top 25% has a composite metric of
0.248.  Similarly, in the seven-theme CCVI, Bartlett's score is
0.050, compared to the score of 0.250 for the last tract in the
top quartile.

reliance on racial criteria.  Importantly, he does not object to
the CCVI's utilization of race-neutral themes for ranking census
tracts.  Instead, he challenges the State's reliance on the CCVI
only to the extent the index uses "minority status and language"
as a theme to identify vulnerable tracts.  But he has not
produced any evidence that Bartlett would move to the top 25%
ranking if that theme were removed from the CCVI.  In other
words, he has not shown that, but for the allegedly
impermissible criteria, he would be eligible to apply for a
vaccine through the equity plan.  Absent such evidence, I cannot
conclude that his injury is either particularized or
redressable.

     On this record, I must conclude that Pietrangelo merely has
a generalized grievance.  "The rule against generalized
grievances applies with as much force in the equal protection
context as in any other." Hays, 515 U.S. at 743.  In an
analogous context, the Supreme Court held in Hays that citizens
who did not live in the district that was the primary focus of
racial gerrymandering lacked standing to bring suit. See id. at
744-45.  The Court rejected the argument that "anybody in the
State has a claim," and reasoned that standing required
"individualized harm." Id. (internal quotation marks omitted).
Pietrangelo has not demonstrated that he is likely to suffer

individualized harm because he is in no different position than anyone else in the State.

Even if Pietrangelo has a concrete and particularized injury, he had not shown that it is likely to be redressed by a favorable court ruling.  Pietrangelo does not challenge the equity plan wholesale but only its preference for minorities. Even if I ordered the State to stop utilizing minority status and language as part of the CCVI algorithm, there is no evidence that Bartlett would rank in the top quartile for vulnerability under the remaining race-neutral themes.  It is mere speculation, then, that Pietrangelo would reside in a vulnerable tract if the court invalidated the State's approach.  Therefore, he has not shown that granting his request for a preliminary injunction would redress his injury by allowing him to request a vaccine under the equity plan.

Pietrangelo's invocation of a stigmatizing injury fares no better.  A "stigmatizing injury" "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." Allen, 468 U.S. at 754 (internal quotation marks and citation omitted).  It does not confer standing to those asserting only a generalized grievance against allegedly illegal government conduct. Hays, 515 U.S. at 743-44.  Again, there is no evidence that Pietrangelo was, or is likely to be in the future, personally

subjected to unequal treatment.  Indeed, he is on equal footing
with minority residents of his census tract, who likewise are
not eligible to participate in the equity plan.  Therefore, the
alleged stigma he claims he suffered because of the State's use
of racial criteria in the equity plan does not satisfy the
injury in fact requirement.

Pietrangelo presents three arguments why he nonetheless has
standing.  All three rest on sheer speculation.  First, he
argues that a person does not have to be a resident of a
vulnerable census tract to get a vaccine through the equity
plan.  In support, he points out that the State does not require
the RPHNs to verify that individuals participating in their
clinics live in a vulnerable census tract; instead, it only
requires verification of their New Hampshire residence.  But the
mere fact that verification of census-tract residence is not
required does not mean that these clinics are open to all New
Hampshire residents.  On the contrary, the equity plan was
designed to serve certain populations in vulnerable census
tracts, and allocation requests from the RPHNs are approved only
if they in fact propose to vaccinate people in those tracts.
Further, the way those clinics operate in practice makes it
exceedingly unlikely that individuals residing in other tracts
would be vaccinated.  The RPHNs work with service agencies or
other local organizations to schedule clinics within vulnerable

census tracts, without widely publicizing their schedule.  Any outreach efforts occur within the targeted vulnerable tracts.

Even if it is conceivable that an RPHN may administer a vaccine to someone residing in a non-vulnerable tract, there is no evidence that this has ever happened.  Pietrangelo has neither attempted to get a vaccine by showing up at an equity clinic nor demonstrated that other ineligible persons have done so.  Thus, it is both speculative and implausible that people from non-vulnerable census tracts are utilizing the equity plan to get their COVID-19 vaccines.

Second, Pietrangelo argues that removing discriminatory criteria from the equity plan would lead to fewer vaccinations as part of that plan and thus increase the number of vaccines that flow back to the general plan.  This, the argument goes, would shorten the amount of time he has to wait for a vaccine in the general plan queue.  To the extent his argument rests on removing minority status and language as a factor in identifying vulnerable census tracts, he has not explained why the overall usage of vaccines as part of the equity plan would decrease.  If anything, logic suggests that the usage would not change substantially.  Because he does not challenge the equity plan as a whole, the plan would continue to take up to 10% of the vaccine supply.  New census tracts would replace existing ones that are included by virtue of having a higher percentage of

minority residents, and populations in those new tracts would
become eligible for vaccination through the equity plan.  There
is no evidence that those new tracts would have fewer residents
who qualify for a vaccine based on race-neutral criteria.

To the extent Pietrangelo argues that eliminating minority
status as a criterion for qualifying for a vaccine would
decrease the demand for vaccines within the equity plan, he
again has no evidence to back up that claim.  He would have to
show, for example, that minorities who do not meet any of the
other criteria represent a high percentage of persons receiving
vaccines through the equity plan.  Absent such evidence, it is
wholly speculative that precluding minorities from qualifying
solely on account of their minority status would meaningfully
impact the distribution of vaccines whereby the equity plan
would utilize significantly fewer doses, leading to higher
vaccine availability for the general plan.

Lastly, Pietrangelo maintains that he has standing because
the State is prioritizing minority residents even within the
general plan.  He relies on language in the State's interim
vaccine allocation plan and guidelines for Phase 1 that can be
read to suggest that vaccine access would be prioritized for
vulnerable geographic areas as part of the general plan.  See,
e.g., Doc. No. 2-4 at 14.  However, the State has submitted
evidence showing that this ambiguous language has been

superseded and that no such prioritizing is occurring within the general plan.  See Doc. No. 13-9; Defs.' Ex. J.  In short, the record dispels the notion that vulnerable regions or minorities are being put to the front of the queue in the general plan.

In sum, in the record before me, there is no evidence that Pietrangelo would be able to apply for a vaccine but for the allegedly discriminatory criteria.  Absent such evidence, he cannot demonstrate that he will suffer in the future a particularized injury that is redressable by a favorable court order.  Accordingly, Pietrangelo has not met his burden of establishing a substantial likelihood of standing to obtain injunctive relief.  See Jacksonville, 508 U.S. at 666; Donahue II, 317 F.3d at 14-15.  By extension, he has not demonstrated a likelihood of success on the merits, which dooms his request for a preliminary injunction.  See Vilsack, 808 F.3d at 913.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, I deny Pietrangelo's request for a preliminary injunction (Doc. No. 2).

SO ORDERED.

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

April 5, 2021

cc:  James E. Pietrangelo, II, pro se
     Daniel E. Will, Esq.
     Laura E. B. Lombardi, Esq.

24